UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                  Plaintiff,<br><br>                  v.<br><br>VERLEY LEE SEMBRITZKY, JR.,<br>BOUNTY OF THE OCEAN INC., AND<br>OCEAN HARVEST LLC,<br><br>                                Defendants. | C.A. No. 4:20-cv-3287 |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against Defendants Verley Lee Sembritzky, Jr. ("Sembritzky"), Bounty of the Ocean Inc. ("Bounty"), and Ocean Harvest LLC ("Ocean Harvest") (collectively, "Defendants") and alleges as follows:

## SUMMARY OF THE ACTION

1. Sembritzky (a/k/a "Rocky" Sembritzky) engaged in an unregistered and fraudulent securities offering that purported to raise funds to implement an innovative, eco-friendly water desalination and mineral extraction process ("Process") to provide clean, low-cost drinking water to the people of Kenya while generating large returns to investors from the sale of minerals. Sembritzky misled investors about how he intended to use investor funds and whether the Process worked.

2. Between August 2015 and March 2017, Sembritzky raised approximately $7.2 million from at least 20 investors in the United States to fund the initial pre-construction costs to

begin building a desalination and mineral recovery plant in Kenya that would use the Process.

3. But the vast majority of investor funds never made it to Kenya. Instead, Sembritzky diverted the funds through his controlled companies, Bounty and Ocean Harvest, for his personal use, including the purchase of a $2 million condo for his then-wife. Further, Sembritzky knew at the time of the offering, and despite assurances to investors, that he had not successfully tested the Process.

4. By reason of this misconduct, Defendants violated, and unless enjoined will continue to violate, the antifraud provisions, and Sembritzky further violated, and unless enjoined will continue to violate, the securities registration provisions, of the federal securities laws. In the interest of protecting the public from further violations, the SEC brings this action seeking permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, a civil penalty, and all other equitable and ancillary relief the Court deems necessary.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)]. This action involves the offer and sale of stock, which is specifically identified in the definitions of "security" under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce or the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

6. Venue is proper in this district pursuant to Section 22(a) of the Securities Act

[15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district. Further, Sembritzky resides in this district, and Bounty and Ocean Harvest each have their principal place of business in this district.

## DEFENDANTS

7. Defendant Sembritzky is an individual who resides in Houston, Texas. Sembritzky is the sole director of Bounty and Ocean Harvest.

8. Defendant Bounty is a Bahamian corporation whose principal place of business is in Houston, Texas.

9. Defendant Ocean Harvest is a Delaware limited liability company whose principal place of business is in Houston, Texas.

## FACTUAL ALLEGATIONS

### A. The Project Offering.

10. The securities offering at issue was described in a written private placement memorandum ("PPM"). The PPM sought to raise a total of $175,500,000 from investors in Kenya and the United States through the sale of stock in a Kenyan entity ("Project Entity") to construct the first of two desalination and mineral recovery plants in Kenya ("Project").

11. The cover page to the PPM explained that "[the Project Entity] is offering U.S. accredited investors the initial pre construction [sic] capitalization investment of $20,000,000.00." The remainder of the $175,000,000 was to come from Kenyan investors. Investors were told that they could purchase stock in the Project Entity at $175,500 per share, and their investment would "yield outstanding returns from [the Project Entity's] mineral

3

processing facilities while providing revenue of over $20 million annually…to bring safe drinking water for all of Kenya…" Sembritzky, as founder of [the Project Entity], "will have control over all engineering and construction until commercial operation of the facility."

12. The PPM assured potential investors that Sembritzky had started research and development on the Process in 2009 at a prior employer, and that each component of the Process purportedly had "years of proven operational history" and had been "financed numerous times." The PPM devoted pages to explaining the Process. According to the PPM, unlike "conventional desalination," the Process was more efficient and costs less to extract minerals, which was the "key competitive advantage, with far-reaching economic rewards and very positive environmental implications."

13. Sembritzky participated in drafting and signed the PPM, and he included his contact information in the PPM document. The PPM was disseminated widely in multiple states to as many investors as possible, with no regard to limiting the universe of investors. Sembritzky sent the PPM to certain of the investors himself, while others received it from an investor who assisted Sembritzky in the solicitation of additional investors. Sembritzky answered investor questions by phone and email, and he accepted investors' subscription agreements on behalf of the Project Entity.

14. Between August 2015 and March 2017, approximately $7.2 million was raised for the Project Entity pursuant to the PPM from at least 20 investors in multiple states within the United States. Sembritzky had no pre-existing, substantive relationship with most, if not all, of the investors. The investors did not have access to substantive information about the actual management, operations, or finances of the Project Entity—a company based thousands of miles

away in Kenya—apart from what they read in the PPM.

15. The offering of the Project Entity's stock, which is a security, was made through a general solicitation. The offering was not registered with the SEC, and no exemptions from registration are applicable to the offering.

**B. Defendants Misappropriated Investor Funds.**

16. Sembritzky directed investors to send their investment funds to Bounty or Ocean Harvest. Investors complied and wired their funds to either Ocean Harvest or Bounty bank accounts that Sembritzky led investors to believe were "operating accounts" for the Project Entity in Kenya. Because Sembritzky controlled Bounty and Ocean Harvest and their bank accounts, he was able to move investor funds as he wished. Within days—and in several instances, the same day—of receiving investor funds, Sembritzky transferred the funds from the purported operating accounts to his personal bank accounts.

17. Between August 2015 and March 2017, of the approximately $7.2 million collected from U.S. investors, Sembritzky withdrew a total of approximately $6.4 million from the Bounty and Ocean Harvest bank accounts in the form of cash withdrawals or transfers to his personal accounts. Sembritzky used the investor funds for a variety of personal expenses and items, including to: purchase an approximately $2 million condominium for his then-wife; buy luxury cars, jewelry, and watches; and pay off personal credit cards.

18. Of the $7.2 million raised from investors, the Project's bank account in Kenya received only approximately $650,000 of investor funds. Because Defendants took nearly all of the investor funds for Sembritzky's personal use, the Project Entity did not receive those funds for the pre-construction costs described in the PPM.

19. The PPM did not authorize Sembritzky to use investor funds for personal use, and it did not disclose that any investor funds would be used for Sembritzky's personal benefit. To the contrary, the PPM specified the projected uses of investor funds raised in the offering, including the anticipated $20 million raise from U.S. investors for pre-construction costs associated with the Project. No funds were allocated for Sembritzky's personal use. The misstatements and omissions in the PPM about how Sembritzky actually intended to use investor funds were false and misleading.

20. Sembritzky knew at the time of the offering that he intended to spend the investor funds on personal expenses. He claims that his personal use of investor funds was part of a projected $15 million Intellectual Property License Payment listed in the PPM. However, the PPM did not disclose that all or any portion of this payment would go to Sembritzky, much less that it would be used for personal expenses (and not an IP license), or that it would come out of the first dollars raised from investors.

21. Further, and unbeknownst to investors, Sembritzky created a one-page side agreement purportedly entered into between Sembritzky, the Project Entity, and Bounty, and executed by Sembritzky on behalf of all parties, that stated the $15 million IP License Payment was a loan to Sembritzky that he would pay back to the company after the first year of operations. Defendants' use of this undisclosed side agreement to misappropriate investor funds was deceptive. Sembritzky's knowledge and state of mind is imputed to Bounty and Ocean Harvest, which are entities he controlled during the relevant period.

### C. The Process Described in the PPM Did Not Work.

22. According to the PPM, the Process would "change the world." Unlike other desalination processes, the Process would utilize everything and waste nothing, eliminate pollution, protect marine life, and yield outstanding returns to investors. The PPM contained an elaborate, scientific-looking diagram to explain how the Process worked. Sembritzky claims he has been working on desalination technology since 2006.

23. Sembritzky knew, however, that when the Process, as described in the PPM, was tested at some point before 2017, it did not work. From at least 2015 to 2017, while raising money from investors, the Process as described in the PPM, by Sembritzky's own admission, either: (1) had not yet been tested, so Sembritzky did not know if it worked despite his assurances to investors; or (2) had been tested and did not work. Either way, Sembritzky knew his representations and omissions to investors about the Process were, at a minimum, misleading.

### FIRST CLAIM FOR RELIEF

**Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**(against Sembritzky)**

24. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

25. By engaging in the conduct described herein, Sembritzky, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce and/or by use of the mails, in connection with the purchase or sale of securities has: (a) employed devices, schemes, and artifices to defraud; and/or (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts,

practices, and courses of business which operate or would operate as a fraud and deceit upon purchasers, prospective purchasers, and any other persons.

26. Sembritzky acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

27. By reason of the foregoing, Sembritzky has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder
### (against Bounty and Ocean Harvest)

28. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

29. By engaging in the conduct described herein, Bounty and Ocean Harvest, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce and/or by use of the mails, in connection with the purchase or sale of securities have: (a) employed devices, schemes, and artifices to defraud; and/or (b) engaged in acts, practices, and courses of business which operate or would operate as a fraud and deceit upon purchasers, prospective purchasers, and any other persons.

30. Bounty and Ocean Harvest acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

31. By reason of the foregoing, Bounty and Ocean Harvest have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## THIRD CLAIM FOR RELIEF

### Section 17(a) of the Securities Act
### (against Sembritzky)

32. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

33. By engaging in the conduct described herein, Sembritzky, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and/or by use of the mails has: (a) employed devices, schemes, and artifices to defraud; and/or (b) obtained money or property by means of untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

34. With regard to Sembritzky's violations of Section 17(a)(1) of the Securities Act, Sembritzky acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness. With regard to Sembritzky's violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, Sembritzky acted at least negligently.

35. By reason of the foregoing, Sembritzky has violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q].

## FOURTH CLAIM FOR RELIEF

### Sections 17(a)(1) and 17(a)(3) of the Securities Act
### (against Bounty and Ocean Harvest)

36. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

37. By engaging in the conduct described herein, Bounty and Ocean Harvest, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and/or by use of the mails have: (a) employed devices, schemes, and artifices to defraud; and/or (b) engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

38. With regard to Bounty's and Ocean Harvest's violations of Section 17(a)(1) of the Securities Act, Bounty and Ocean Harvest acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness. With regard to Bounty's and Ocean Harvest's violations of Section 17(a)(3) of the Securities Act, Bounty and Ocean Harvest acted at least negligently.

39. By reason of the foregoing, Bounty and Ocean Harvest have violated and, unless enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(1) and (3)].

**FIFTH CLAIM FOR RELIEF**

**Sections 5(a) and 5(c) of the Securities Act**
**(against Sembritzky)**

40. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

41. By engaging in the conduct described above, Sembritzky, directly or indirectly, singly and in concert with others, has (a) made use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement

was in effect; and/or (b) for the purpose of sale or delivery after sale, carried and caused to be carried through the mails and in interstate commerce, by the means and instruments of transportation, securities as to which no registration statement was in effect; and/or (c) made use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement has been filed.

42. By reason of the foregoing, Sembritzky violated, and unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and 77(e)(c)].

## **RELIEF REQUESTED**

Therefore, the SEC respectfully requests that this Court:

(a) Permanently enjoin Sembritzky from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(b) Permanently enjoin Bounty and Ocean Harvest from violating, directly or indirectly, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

(c) Permanently restrain and enjoin Sembritzky from, directly or indirectly, including, but not limited to, through any entity owned by or controlled by Sembritzky, soliciting or accepting funds from any person or entity for any unregistered

offering of securities;

(d) Order Defendants to disgorge all ill-gotten gains realized by them, plus prejudgment interest;

(e) Order Sembritzky to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(f) Grant such further relief as this Court may deem just and proper.

Dated: September 22, 2020　　　　　　　　Respectfully submitted,

*/s/ Keefe M. Bernstein*
Keefe M. Bernstein
Attorney-in-Charge
Texas Bar No. 24006839
S.D. Texas Bar No. 24448
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, TX 76102
(817) 900-2607 (phone)
(817) 978-4927 (facsimile)
bernsteink@sec.gov

Counsel for Plaintiff
Securities and Exchange Commission